United States District Court

For the Northern District of California

1

2

3

4

5

6                 IN THE UNITED STATES DISTRICT COURT

7              FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

10

11   VERN BARBERO,                      No. C 04-0221 CW

12          Plaintiff,                  ORDER GRANTING
                                        DEFENDANT'S
13      v.                              MOTION FOR
                                        SUMMARY JUDGMENT
     JO ANNE B. BARNHART,
14   Commissioner of Social Security,

15          Defendant.

16   _____/

17

18      Plaintiff Vern Barbero moves for summary judgment or for

19   remand.  Defendant Jo Anne B. Barnhart in her capacity as

20   Commissioner of the Social Security Administration opposes the

21   motion and cross-moves for summary judgment.  Having considered

22   all of the papers filed by the parties, the Court GRANTS

23   Defendant's motion for summary judgment and DENIES Plaintiff's

24   motion for summary judgment or remand.

25                           BACKGROUND

26   I. Procedural History

27      On April 1, 1996, Plaintiff Vern Barbero filed an

28

**United States District Court**
For the Northern District of California

application for Social Security disability benefits under Title II of the Social Security Act, alleging disability due to spinal disease beginning on November 21, 1987. (Administrative Record (AR) at 960) Plaintiff was sixty-two years old at the time he filed his application for Social Security disability benefits. (Id. at 961)[1] His initial application was denied, as was his appeal. (Id. at 960) On October 31, 1997, the Administrative Law Judge found that Plaintiff was not disabled on or before his date last insured (DLI), December 31, 1992, because Plaintiff had continued to perform substantial gainful activity up to his DLI. (Id. at 16, 19) This ruling was adopted as the final decision of the Commissioner of Social Security. (Id. at 924) Plaintiff filed a lawsuit in this court, Barbero v. Apfel, C-99-2253 MEJ, alleging that a person cannot receive "substantial income" from a business operating at a loss, and therefore the ALJ's finding that Plaintiff had engaged in substantial gainful activity through December 31, 1992 was legal error. (Id. at 937) On March 30, 2001, Magistrate Judge Maria-Elena James ruled that the ALJ's decision was unsupported by substantial evidence, reversed the decision of the Commissioner and remanded the case to the Social Security Administration. (Id. at 944)

On May 7, 2002, a hearing was held before a different ALJ in San Francisco, California. (Id. at 950) On May 15, 2002,

---

[1]On March 22, 1996, his 62nd birthday, Plaintiff had begun receiving Social Security retirement benefits of approximately $845 a month. (Id. at 930)

2

that ALJ issued an order denying Plaintiff's claim, finding that, although Plaintiff had not engaged in substantial gainful activity since November 21, 1987, he retained the capacity to perform light work and was able to engage in his past employment. (Id. at 964-65)  Plaintiff requested Appeals Council review. (Id. at 974)  In November, 2002, the council granted review and remanded with instructions for the ALJ to consider the testimony of a vocational expert in the determination of whether Plaintiff's job skills were transferrable to other sales occupations in the national economy, as well as whether Plaintiff's job skills were transferrable to other non-sales occupations. (Id. at 983-84) The council instructed the ALJ to "identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p)" before relying on the vocational expert's testimony. (Id. at 984)

On April 7, 2003, the ALJ held a supplemental hearing on Plaintiff's claim. (Id. at 803)  On April 11, 2003, the ALJ issued a second decision denying Plaintiff's claim, based on the conclusion that Plaintiff could perform his past work. (Id. at 802-03)  On December 15, 2003, the Appeals Council denied review and the ALJ's April 11, 2003 Order became the final decision of the Commissioner. (Id. at 793)

II. Employment and Medical History

3

**United States District Court**
For the Northern District of California

Plaintiff received a high school education and attended approximately one semester of college. (Id. at 877) In 1959, he began working as a sales representative. (Id. at 790) In 1972, he became a traveling sales representative working on commission for manufacturers of novelty gift items, visiting between fifteen and forty stores a day, and working more than forty hours per week. (Id. at 39, 790, 830, 862). At his 2002 hearing, Plaintiff testified that his case of product samples had weighed "nothing." (Id. at 830) However, later at the 2002 hearing, when he was questioned by the vocational expert, Plaintiff testified that his job had required him to lift boxes of samples that weighed between thirty to fifty pounds. (Id. at 856)

Plaintiff's first car accident was in the early 1980's. (Id. at 40) After this accident he attempted to return to work full-time but could only maintain part-time employment because he suffered back injuries and was "thinking a lot slower." (Id. at 832) In November, 1987, Plaintiff was involved in a second accident, a head-on automobile collision. (Id. at 709) He lost consciousness for a few seconds and later experienced aches and pains in his low back, spreading to his legs, and cramps in his feet and toes. (Id.) He fractured his left wrist. (Id. at 744) After his 1987 accident, Plaintiff worked on a reduced schedule and stopped earning net income. (Id. at 832) In March, 1988, Plaintiff was involved in another car accident in which he was rear-ended. (Id. at 728) In 1994, Plaintiff had a bicycle accident and broke a finger on his right hand. (Id. at

United States District Court

For the Northern District of California

66)

In 1985, Plaintiff had earned $4,332 in net profit. (<u>Id.</u> at 106)  In 1986, Plaintiff earned $4,901 in net profit. (<u>Id.</u>) In 1987, Plaintiff earned $2,620 in net profit. (<u>Id.</u> at 106, 259)  For 1988, Plaintiff reported a business loss of $409 on his federal income tax return. (<u>Id.</u> at 246)  For 1990, Plaintiff reported a business loss of $36. (<u>Id.</u> at 213)  For 1991, Plaintiff earned gross receipts of $15,551 but had $566 in business losses. (<u>Id.</u> at 963, 205)  In 1992, Plaintiff earned $16,957 in gross receipts and had $862 in business losses. (<u>Id.</u> at 174, 177)

Plaintiff traveled 29,328 miles in 1990, 28,567 miles in 1991 and 59,904 in 1992 to make sales calls. (<u>Id.</u> at 219, 199, 182)  In 1990, Plaintiff incurred business expenses of $2,593 on hotels, $3,006 on meals and $7,828 on phone calls. (<u>Id.</u> at 216) In 1991, Plaintiff incurred business expenses of $2,693 on travel, $938 on meals and entertainment and $7,510 on phone calls. (<u>Id.</u> at 194)  In 1992, Plaintiff incurred business expenses of $2,900 on travel, $5,561 on meals and entertainment and $8,348 on phone calls. (<u>Id.</u> at 177)

Between 1987 and 1988, Plaintiff visited Drs. Friedman, Sapienza, Shen, Klein, Steinhardt, Dorsay, Wang, Peterson, Friedman, Degalos, Rosenberg and additional unidentified physicians.  Plaintiff informed the Social Security Administration that, in 1986 or 1987, Dr. Friedman prescribed physical therapy for him. (<u>Id.</u> at 108)  The remaining visits are chronicled in Plaintiff's medical records.  On December 9,

United States District Court

For the Northern District of California

1987, Dr. Sapienza recorded Plaintiff's complaints of neck and back pain.  (<u>Id.</u> at 747)  Dr. Shen and an unidentified doctor also reported Plaintiff's complaints of a stiff neck and pain in his low back, cervical spine and left leg.  (<u>Id.</u> at 707, 740)  On December 21, 1987, Dr. Klein diagnosed Plaintiff's left wrist fractures, suffered in the 1987 car accident, as healing.  (<u>Id.</u> at 744)

On January 16, 1988, Dr. Steinhardt concluded that x-rays of Plaintiff's cervical spine showed "rather severe degenerative disc disease of the lower cervical spine," and "rather severe degenerative changes" in the lower lumbar spine.  (<u>Id.</u> at 736)  On June 21, 1988, Dr. Dorsay concluded that a CT scan of Plaintiff's lumbar spine showed a broad-based disc bulge at the level of L4-5 placing pressure on the thecal sac (encasing the spinal cord), consistent with a synovial cyst, and small joint disease at L4-5.  (<u>Id.</u> at 734)  He also noted Plaintiff's "LBP" (presumably lower back pain) despite his regimen of prednisone and other medications and physical therapy.  (<u>Id.</u>)

On an unidentified date, Dr. Rosenberg noted Plaintiff's constant low back pain, numbness in his right thigh and chronic neck pain.  (<u>Id.</u> at 728)  He noted that Plaintiff's physical therapy was helping, but that there was "no clear response to meds."  (<u>Id.</u>)  On an unidentified date, Dr. Rosenberg requested consultation on Plaintiff's back pain and a recommendation on whether surgery for his synovial cyst would help the pain.  (<u>Id.</u> at 730)  An unidentifiable doctor's report noted that he or she was "not sure if the cyst observed on CAT is the source of his

pain." (Id. at 727)  At that time, the physician prescribed Plaintiff various pain relief modalities, including a lumbar corset, a transcutaneous electrical nerve stimulation (TENS) unit and medication. (Id.)

In approximately August, 1988, Dr. Rosenberg reported that Plaintiff complained of pain and prescribed regular use of the TENS unit and bicycling. (Id. at 711)  On August 11, 1988, Dr. Wang noted that Plaintiff told him that his back pain was making it difficult to walk or work more than a week at a time. (Id. at 715)  Plaintiff informed Dr. Wang that his back pain continued, that the TENS unit was not helping and that physical therapy afforded him only some relief. (Id.)  On August 24, 1988, Dr. Peterson, a neurosurgeon, noted that Plaintiff complained of low back pain, a stiff neck and constant numbness in his right leg from knee to hip. (Id. at 709)  Dr. Peterson was not sure the disk bulge at L4-5 explained Plaintiff's bilateral symptoms and wanted to try alternative measures before performing an open procedure to decompress the disk bulge. (Id.)  After 1988, there is no record of further treatment for Plaintiff's back condition.

On May 2, 1996, State Agency examiners for the Social Security Administration, based on reviews of Plaintiff's medical records, diagnosed Plaintiff with "Disorders of the Back (Discogenic & Degenerative)" and determined that he was not disabled through his DLI. (Id. at 71)  The June 20, 1996 reconsideration assessment by the Social Security Administration amended Plaintiff's diagnosis to include a secondary diagnosis

United States District Court

For the Northern District of California

of "Osteoarthritis & Allied Disorders" and affirmed the previous

conclusion that Plaintiff was not disabled through his DLI.

(Id. at 72)

III. The ALJ Hearings

    A. May 12, 1997 Hearing

    At the administrative hearing on May 12, 1997, Plaintiff

testified to his present employment conditions, and his

vocational history and medical condition between the onset of

his disability in 1987 and his DLI in 1992.  (Id. at 33)

    Plaintiff testified that, on a typical day at the time of

the hearing, it took him three and a half to four hours to

prepare himself to leave the house.  (Id. at 45-46)  A few times

a week he was not able to get up at all.  (Id. at 46) He could

only stand or walk for twenty or thirty minutes before he needed

to lie down or recline for about fifteen minutes.  (Id. at 43)

Plaintiff continued to do his own light grocery shopping and

could carry his groceries home.  (Id. at 53)  His cooking

regimen was restricted to microwaveable foods and he vacuumed

about once a month.  (Id. at 53-54)

    Plaintiff testified that his current part-time job required

that he lift small, lightweight boxes of product samples onto a

luggage cart and roll them in to visit his accounts.  (Id. at

44)  In order to visit accounts, he arrived at his destination

the day before to rest in a motel.  (Id. at 46-47)  He returned

to the motel between calls to rest for thirty or forty minutes.

(Id. at 47)  He generally made two sales calls a day, but may

have made up to four on a good day.  (Id.)  Plaintiff was

United States District Court

For the Northern District of California

selling a new "hot item" which he hoped would increase his gross earnings. (Id. at 48)  Although Plaintiff had no reportable income, he lived on investments made with the funds he received from settlements resulting from car accidents. (Id. at 59)

Plaintiff also testified to his medical history.  He went to physical therapy for his back for a few years, but "it seem[ed] like all that therapy just aggravated the situation." (Id. at 49) He also testified that he felt like he "wasn't getting any real benefit from that therapy and all I did, it just was wearing me out just to get down there.  I'd just as soon put that effort into something else." (Id. at 65-66)  He did not feel improvement and a doctor had told him to do "whatever feels best," so he stopped physical therapy and began lying down during the day. (Id. at 49-50)  He also used to take pain medication, but felt it "cloud[ed] the mind" and interfered with his "body functions." (Id. at 50)  At least one doctor suggested back surgery to Plaintiff, but he feared it would cause further damage to his back and decided not to pursue it. (Id. at 54)

B. May 7, 2002 Hearing

At the May 7, 2002 hearing, Plaintiff, the medical expert, Dr. Louis Lesko, and the vocational expert, James Grier, testified.

Plaintiff testified that from 1988 to 1992 he was on the road in hotels only every other week and repeated the limitations that he had described in the 1997 hearing. (Id. at 831-35)  He testified that he stopped visiting Fisherman's

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Wharf, his most lucrative territory, because he was unable to walk to all of the stores; he could walk only a block before becoming exhausted. (<u>Id.</u> at 837)  He also testified that some of his top items were no longer popular and this hurt his sales. (<u>Id.</u> at 831-33)

Plaintiff again described the 1987 car accident and his subsequent medical history. (<u>Id.</u> at 839)  He was in physical therapy, but quit after a few years, and had difficulty with the pain medication because "[t]hey gave me so much stuff that I couldn't even see where I was going." (<u>Id.</u> at 840)  The pain did not get better, so Plaintiff "just started dealing with it or just learned to live with it more." (<u>Id.</u> at 841)  He bought a TENS unit, but it did not help the pain. (<u>Id.</u> at 844)

The medical expert, Dr. Lesko, questioned Plaintiff. (<u>Id.</u> at 845)  Plaintiff testified that his primary pain medication was Motrin and aspirin. (<u>Id.</u> at 847)  He also testified that he had back pain prior to the 1987 car accident, but that that accident aggravated his condition. (<u>Id.</u> at 848)  Dr. Lesko then provided his opinion, based on Plaintiff's testimony and medical records. (<u>Id.</u> at 849)  He concluded that Plaintiff's back pain was due to a pre-existing degenerative condition, specifically a synovial cyst in the lumbar spine. (Id.)  The 1987 accident caused minor injuries, including a wrist fracture and loss of consciousness. (<u>Id.</u> at 850)  It aggravated his back and neck pain, but the changes noted in later x-ray and CT scan findings were present before the 1987 accident. (Id. at 851)  The aggravation of his back pain caused by the car accident normally

10

**United States District Court**
For the Northern District of California

would not last five years.  (<u>Id.</u>)  Plaintiff likely returned to his pre-1987 level of pain six months after the accident.  (<u>Id.</u>) Based on the changes to Plaintiff's back and neck, Dr. Lesko evaluated his residual functional capacity (RFC), defined as the maximum level of work-related activities that a claimant can perform in spite of his limitations, 20 C.F.R. § 404.1545, and stated that Plaintiff was capable of light work.  (<u>Id.</u> at 852)

The vocational expert, James Grier, ascertained Plaintiff's level of education.  (<u>Id.</u> at 855)  Mr. Grier then testified that the Dictionary of Occupational Titles (DOT) defined Plaintiff's past relevant work as "sales representative for wholesale jewelry," which is skilled, light work.  (<u>Id.</u> at 855)  Because Plaintiff had testified that, before his accident, he regularly lifted thirty to fifty pounds in his work, Mr. Grier stated that this placed the job, as actually performed, at the medium level work.  Therefore, Mr. Grier concluded that Plaintiff could perform his past job "not as actually but as typically performed."  (<u>Id.</u> at 856)

C. April 7, 2003 Hearing

At the April 7, 2003 hearing, held pursuant to the December 9, 2002 Appeals Council's remand order, Plaintiff and vocational expert Gerald Belchick testified.  (<u>Id.</u> at 860)  The council ordered a review of the former vocational expert's comparison of Plaintiff's job to that of a jewelry salesman. (<u>Id.</u>)

Plaintiff again testified to the current requirements of his job as a sales representative.  (<u>Id.</u> at 862-63)  He told Mr. Belchick that his cases of product samples were very heavy and

11

that he pushed multiple cases, each weighing thirty or forty pounds and cumulatively weighing 200 or 300 pounds, on a hand truck to his sales calls.  (Id. at 864)

Mr. Belchick provided his opinion of Plaintiff's actual performance, classifying it as "a light exertional level."  (Id. at 865)  He stated that "several hundred pounds held on a simple, wheeled in, as opposed to being carried in, that wouldn't change

-- appreciably wouldn't change the light lifting load.  I mean, if he was having to lift them all at one time, it would be a whole different story. . . . But as he described it just now, I think we're very much within the small part of calling it a light exertional level."  (Id.)  He found no sales jobs in the DOT which exceeded light work and concluded that all sales jobs are light.  (Id.)  He characterized Plaintiff's job as "sales representative, novelties."  (Id.)  Because Plaintiff could lift twenty pounds occasionally and ten pounds frequently and walk at least six hours in an eight hour day and had few activity restrictions, Mr. Belchick concluded that Plaintiff could perform the full range of light work, including his past relevant work.  (Id. at 868)

IV. The ALJ Decisions

A. The May 15, 2002 Order

Pursuant to SSA regulations, the ALJ performed the five-step sequential evaluation process to determine whether Plaintiff was entitled to benefits under the Social Security

United States District Court

For the Northern District of California

Act.[2]  (AR at 960-65)

First, the ALJ examined the tax records presented by Plaintiff and concluded that Plaintiff did not have net earnings after 1988 and that he had not engaged in substantial gainful activity after his date of onset, November 21, 1987.  (Id. at 961-62)

Second, the ALJ found Plaintiff's impairments were "severe" because they had more than a minimal effect on his ability to work.  (Id. at 962)  At the third step, the ALJ found that the record did not demonstrate that Plaintiff suffered from an impairment sufficiently severe to constitute a listed impairment from 20 C.F.R. Part 220, Appendix 1.  (Id.)

Fourth, the ALJ considered Plaintiff's medical records, the State Agency examiners' evaluations, medical expert testimony and Plaintiff's testimony to determine his RFC.  (Id. at 962-63) The ALJ considered Plaintiff's alleged inability to earn net

---

[2] The five steps of the inquiry are: (1) Is the plaintiff presently working in a substantially gainful activity?  If so, then the plaintiff is not disabled within the meaning of the Social Security Act.  If not, proceed to step two.  (2) Is the plaintiff's impairment severe?  Is so, proceed to step three.  If not, then the plaintiff is not disabled.  (3) Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1?  If so, then the plaintiff is disabled.  If not, proceed to step four.  (4) Is the plaintiff able to do any work that he or she has done in the past?  If so, then the plaintiff is not disabled.  If not, proceed to step five.  (5) Is the plaintiff able to do any other work?  If so, then the plaintiff is not disabled.  If not, then the plaintiff is disabled.  Bustamante v. Massanari, 262 F.3d 949, 953 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520, 416.920).

The plaintiff maintains the burden of proof for steps one through four.  However, should an inquiry proceed to step five, the burden then shifts to the Commissioner.

13

profits after his 1987 accident and found that Plaintiff's testimony that he could only work every other week and that he had to lie down frequently was "not credible based upon the paucity of medical treatment and medication usage, the extent of his work activities, and the opinions of the State Agency examiner and the medical expert regarding claimant's limitations." (<u>Id.</u> at 963)  The ALJ concluded that Plaintiff was not precluded from performing "light work."  (<u>Id.</u>)

The ALJ agreed with the vocational expert's testimony that Plaintiff's current employment was comparable to the "light work" occupation of "sales representative/jewelry," as defined by the DOT Code 279.357-018.  (<u>Id.</u>)  The ALJ concluded that the "sales representative/jewelry" position sufficiently incorporated the skills and activities used by Plaintiff in his past work as a sales representative for novelty gift items and that Plaintiff was capable of performing his past work.  (<u>Id.</u> at 964)

The ALJ concluded that Plaintiff was not disabled as defined in the Social Security Act at any time through the date of the decision and that his RFC allowed him to perform light work.  (<u>Id.</u> at 963, 965)

B. The April 11, 2003 Order

In the April 11, 2003 Order, after remand for a review of the classification of Plaintiff's previous employment and Plaintiff's ability to transfer his work skills to other occupations, the ALJ again performed the five-step sequential evaluation process required by SSA regulations.  (<u>Id.</u> at 803)

14

**United States District Court**
For the Northern District of California

Steps one through three were unchanged from the previous order and, for the reasons given in the previous order, the ALJ again concluded that Plaintiff's testimony was not credible.

At step four, pursuant to the instructions of the Appeals Council, the ALJ engaged in a "function by function assessment" of Plaintiff's RFC and corresponding categories of employment. (Id. at 805)  He explained that light work involves lifting objects of no more than twenty pounds or frequently lifting or carrying objects weighing up to ten pounds.  (Id.)  A job may be classified as light when it does not require significant lifting, but does require a fair amount of walking or standing or sitting with some pushing and pulling of arm or leg controls. (Id.)  Incorporating the discussion presented in his May 15, 2002 Order, the ALJ found that Plaintiff:

> was able to lift and/or carry 20 pounds occasionally
> and 10 pounds frequently, stand and/or walk (with
> normal breaks) for a total of about 6 hours in an
> eight-hour workday, . . . and has unlimited ability to
> push and/or pull (including operation of hand and/or
> foot controls).

(Id.)

On the basis of this information and the testimony of vocational expert Gerald Belchick, who testified that Plaintiff's past work as a sales representative for novelty items was classified in the DOT as light, the ALJ found that Plaintiff could still perform his past relevant work as a sales representative of novelties and gifts.  (Id. at 806)

The ALJ concluded that Plaintiff's RFC would allow him to engage in light work, including his past relevant work.  (Id. at

15

805)  Therefore, at step four, the ALJ again concluded Plaintiff was not disabled as defined in the Social Security Act at any time through the date of the decision.  (Id. at 806)

LEGAL STANDARD

If the ALJ issues an unfavorable decision denying benefits, a court cannot set it aside unless the ALJ's findings are based upon legal error or are not supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997); Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Orteza v. Shalala, 50 F.3d 748, 749 (9th Cir. 1995).

To determine whether substantial evidence exists to support the ALJ's decision, a court reviews the record as a whole, not just the evidence supporting the decision of the ALJ.  Thompson v. Schweiker, 665 F.2d 936, 939 (9th Cir. 1982) (citing Walker v. Matthews, 546 F.2d 814, 818 (9th Cir. 1976)).  If there is substantial evidence to support the decision of the ALJ, it is well-settled that the decision must be upheld even when there is evidence on the other side, Hall v. Sec'y of Health, Educ. and Welfare, 602 F.2d 1372, 1374 (1979), or when the evidence is susceptible to more than one rational interpretation, Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984).  If supported by substantial evidence, the findings of the court as to any fact shall be conclusive.  42 U.S.C. § 405(g); Vidal v. Harris, 637 F.2d 710, 712 (9th Cir. 1981).  It must therefore be more than a

16

**United States District Court**
For the Northern District of California

"mere scintilla" of evidence.  <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1939); <u>Desrosiers v. Secretary of Health and Human Services</u>, 846 F.2d 573, 577 (9th Cir. 1988); <u>Swanson v. Secretary of Health and Human Services</u>, 763 F.2d 1061, 1064 (9th Cir. 1985).

If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Flaten</u>, 44 F.3d at 1457. The reviewing court may not decide the facts anew or reweigh the evidence, but it must be more than an uncritical rubber stamp. <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986).  A decision that is supported by substantial evidence will nevertheless be set aside if proper legal standards were not applied in weighing the evidence and making the decision.  <u>Wilson v. Shalala</u>, 841 F. Supp. 1491, 1494 (E.D. Wash. 1994).

DISCUSSION

Plaintiff argues that the ALJ failed to cite clear and convincing reasons for concluding that Plaintiff's testimony regarding his subjective symptoms was not credible.  He argues that, by disregarding this testimony, the ALJ reached an incorrect finding that Plaintiff retained an RFC for light work and could return to his past work as a sales representative.

I. Standard of Review for Assessing Plaintiff's Credibility

In <u>Cotton v. Bowen</u>, 799 F.2d 1403 (9th Cir. 1986), the Ninth Circuit developed a threshold test to determine the credibility of a claimant's subjective symptom testimony.  Under <u>Cotton</u>, a

claimant "must produce objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (en banc) (quoting Cotton, 799 F.2d at 1407-08); see also Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996). Cotton requires "only that the causal relationship be a reasonable inference, not a medically proven phenomenon." Smolen, 80 F.3d at 1282. Therefore, a claimant is not required to produce objective medical evidence of the pain itself or its severity. Id. (citing Bunnell, 947 F.2d at 347-48). "It is improper as a matter of law for an ALJ to discredit excess pain testimony solely on the ground that it is not fully corroborated by objective medical findings." Cotton, 799 F.2d at 1407; Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989).

Once a claimant meets the Cotton test, "the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupportable by objective evidence. Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reason for rejecting the claimant's testimony must be 'clear and convincing.'" Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (quoting Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)); Smolen, 80 F.3d at 1281. When outlining the findings supporting a conclusion that a plaintiff's testimony is incredible, the ALJ must consider "all of the available evidence" in analyzing the severity of the claimed pain. SSR

18

88-13.  Factors to be analyzed include: (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors; (3) type, dosage, effectiveness and adverse side effects of any pain medications; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the plaintiff's daily activities.  Id.; see Fair, 885 F.2d at 603 (types of activities ALJ may rely on to find pain allegations credible include the type of daily activities performed by plaintiff and whether plaintiff sought or followed treatment); Osenbrock v. Apfel, 240 F.3d 1157, 1166 (9th Cir. 2001) (finding rejection of plaintiff's alleged pain justified where plaintiff had little evidence of spinal abnormalities, had not used strong pain medication, had not participated in pain management or physical therapy, and limited daily activities by choice not necessity).  However, medical evidence is still relevant in determining the severity of a plaintiff's alleged pain and its disabling effects.  20 C.F.R. § 404.1529(c)(2); Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

The ALJ's finding on the plaintiff's credibility should be given "great weight."  Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986).  "This type of credibility determination is within the province of the ALJ, and cannot be disturbed where . . . it is supported by specific findings."  Van Han v. Bowen, 882 F.2d 1453, 1458 n.8 (9th Cir. 1989); see also Walker, 546 F.2d at 820 ("It is not within our province to judge the credibility of the witnesses before the Administrative Law Judge").

II. Analysis

    A. Evidence of underlying impairments and causal relationship
        between the impairments and Plaintiff's symptoms

    Pursuant to the <u>Cotton</u> threshold test, Plaintiff presented objective evidence of a medical condition.  In the May 15, 2002 Order, the ALJ concluded that Plaintiff presented evidence to demonstrate the presence of "orthopedic impairments which could reasonably be expected to cause some degree of functional restriction."  (<u>Id.</u> at 963)  In the April 11, 2003 Order, the ALJ accepted the presence of osteoarthritis, cervical and lumbar degenerative changes, lumbar synovial cyst and cervical spondylosis as demonstrated by laboratory tests and radiographic evidence.  (<u>Id.</u> at 804)

    B. The ALJ's Credibility Analysis

    In the May 15, 2002 Order, which was incorporated into the April 11, 2003 Order, the ALJ found that "the extent of symptoms are not substantiated by objective medical evidence" and proceeded to a credibility analysis.  (<u>Id.</u> at 963)

    Plaintiff contests the use of three pieces of evidence to challenge the credibility of his testimony regarding his RFC: (1) his lack of medical treatment after 1989, (2) his continued employment after 1988, and (3) the opinions of non-examining, non-treating State Agency examiners and an expert physician. Defendant argues that the ALJ properly relied on this evidence, which collectively supports the ALJ's disbelief of Plaintiff's testimony and serves as substantial evidence of Plaintiff's ability to perform light work.

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1. Plaintiff's Lack of Medical Treatment after 1989

Plaintiff argues that the ALJ improperly considered his lack of medical treatment between 1989 and his DLI, December 31, 1992. He argues that Social Security Ruling 96-7p requires the ALJ not to draw any inferences about symptoms from a failure to seek regular medical attention without first considering Plaintiff's explanation for this lack of medical care. Defendant argues that the ALJ properly considered Plaintiff's "conservative medical care" and his reasons for not seeking additional care as required by Social Security Ruling 96-7p; therefore, he did not err in discrediting Plaintiff's subjective complaints.

Under Social Security Ruling 96-7p, the credibility analysis must not contain:

> any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

1996 S.S.R. 7p, *21.

Social Security Ruling 96-7p lists potentially legitimate explanations for lack of treatment, including the restructuring of daily activities to minimize symptoms and the negative side-effects of medication. 1996 S.S.R. 7p, *22. However, under Smolen, the ALJ may give weight to an "inadequately explained failure to seek treatment." Smolen, 80 F.3d at 1284.

Plaintiff testified that during the period following his 1987 car accident the pain never improved and only continued

21

**United States District Court**
For the Northern District of California

getting worse.  (<u>Id.</u> at 42-43)  During the only period that
Plaintiff did seek treatment, from the 1987 accident through
1989, he received physical therapy and medications for a period
of less than twelve continuous months.  (<u>Id.</u>)  Plaintiff did not
elect surgery, (<u>id.</u> at 840), and eventually stopped prescribed
treatments, such as physical therapy, the TENS unit and
prescription pain medications, because they did not help. (Id.
at 839-40, 889)

The ALJ noted Plaintiff's lack of treatment after 1989 and
the absence of evidence that Plaintiff was seen regularly for
his medical condition during the three years before his DLI and
the seven years before he filed his application for Social
Security disability benefits.  (<u>Id.</u> at 963)  The ALJ concluded
that the severity of Plaintiff's symptoms was not supported by
his medical records or decisions regarding his medical care and,
although not explicitly stated, that Plaintiff failed adequately
to explain his failure to seek treatment from 1989 until his
DLI.  (<u>Id.</u>)

Although the ALJ did not specify why he did not find
sufficient Plaintiff's explanations for not seeking further
treatment, the record supports the ALJ's conclusion that
Plaintiff's reasons were not sufficient.  Plaintiff's reason for
not pursuing physical therapy was that he wasn't getting any
benefit from it and that "it was wearing me out just to get down
there.  I'd just as soon put that effort into something else."
Plaintiff also stated that a doctor had told him to do what
feels best, so he stopped physical therapy and started to lie

22

down during the day.  These reasons for not seeking further

treatment are insufficient in light of Plaintiff's testimony

that after the 1987 car accident his pain never improved and

only got worse.

The ALJ's conclusion that Plaintiff's testimony that he had

to limit his work activities and lie down frequently and that he

had sitting and standing restrictions is not credible is

supported by Plaintiff's medical records and evidence of lack of

treatment.

### 2. Plaintiff's Continued Employment

Plaintiff argues that the ALJ improperly relied on his work

activity from 1988 to 1992 to challenge his credibility.  He

argues that, although he continued to work, his ability to work

was reduced because he could not maintain full-time employment

and therefore he did not accrue net earnings.

Individuals seeking Social Security benefits should not be

penalized for attempting to perform the daily activities which

are consistent with their physical impairments and limitations.

Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  However,

activities inconsistent with a plaintiff's claimed limitations

may negatively affect the credibility of his claims regarding

subjective symptoms.  Id.

Plaintiff testified that he has made no net profit since

1987, (id. at 106, 827, 832, 897-98), and the evidence in the

record shows a decline in Plaintiff's financial productivity

between 1987 and his DLI.  (Id. at 106, 259)  However, Plaintiff

continued to amass considerable gross receipts, (id. at 963),

**United States District Court**
For the Northern District of California

23

United States District Court

For the Northern District of California

and traveled a significant amount to make sales calls. (<u>Id.</u> at 219, 199)

In the May 15, 2002 decision, the ALJ made a specific finding that "[Plaintiff's] allegations are also inconsistent with the extent of his work activities as indicated by both his hearing testimony and his tax returns. . . ." (<u>Id.</u> at 964)  In the decision, he quoted Plaintiff's gross receipts from his 1991 and 1992 tax returns and highlighted Plaintiff's testimony regarding the extent of his work activity. (<u>Id.</u> at 963)

The ALJ concluded that Plaintiff failed to meet his burden of demonstrating that "his medical condition precluded him from performing substantial gainful activity" because of this evidence of continued employment and high business-related expenses. (<u>Id.</u>)  The ALJ had concluded that Plaintiff was not performing substantial gainful activity, pursuant to step one of the disability analysis. (<u>Id.</u> at 962)  However, in determining Plaintiff's RFC at step four he concluded, "[T]he undersigned is not persuaded from the medical evidence that claimant's decreased work activity was related solely to his medical problems" because of his continued gross earnings and expenses. (<u>Id.</u> at 963)  This conclusion is supported by evidence in the record, which indicates that there are other reasons why Plaintiff's work activity and earnings may have decreased. Plaintiff testified that his previously successful products were no longer selling. (<u>Id.</u> at 831-33)

Because Plaintiff's testimony is inconsistent with his continued gross earnings and business expenses and travel, the

ALJ's credibility determination is supported by these findings based on the record.

### 3. The Testimony of State Agency Examiners and Medical Expert

Plaintiff argues that the ALJ cannot rely on the opinions of State Agency physicians or the testimony of the medical expert, Dr. Louis Lesko, to discredit his testimony.  Defendant agrees that these medical opinions alone do not constitute substantial evidence, but argues that when combined with Plaintiff's minimal medical treatment and continuing work-related activities, the totality constitutes substantial evidence.

The ALJ may properly rely on the testimony of non-examining physicians as substantial evidence in the credibility analysis if their testimony is supported by other evidence in the record. Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) ("The opinions of non-treating or non-examining physicians may also serve as substantial evidence [to reject the opinion of a treating physician] when the opinions are consistent with independent clinical findings or other evidence in the record.")

In the May 15, 2002 Order, the ALJ summarized the State Agency examiners' conclusion as follows:

> State Agency examiners concluded that at the time his
> insured status expired (December, 1992) that [sic]
> claimant had the residual functional capacity to
> perform light work.

(AR at 962)  The ALJ then summarized the medical expert, Dr. Lesko's conclusion as follows:

> At the hearing the medical expert, Dr. Lesko,
> summarized and discussed the medical evidence and
> concluded that after his 1987 motor vehicle accident

25

United States District Court
For the Northern District of California

                (and thereafter) claimant had the residual functional
                capacity to perform light work.  [Dr. Lesko] also felt
                this was true after claimant's 1994 treatment for the
                bicycle accident and this was as a prophylactic
                measure since heavier work might aggravate claimant's
                condition.

(<u>Id.</u>)

     The ALJ concluded that the opinions of the State Agency

examiner and the medical expert were supported by Plaintiff's

testimony regarding his work activities, evidence regarding his

work activities, his medical records and the lack of medical

treatment and medication usage.  (<u>Id.</u> at 963)  The ALJ gave

these opinions significant weight because he found that

Plaintiff's testimony was not supported by the medical records.

(<u>Id.</u>)

     The State Agency medical examiners relied on two of

Plaintiff's medical reports and found insufficient evidence that

Plaintiff's condition affected his ability to work as of his

DLI.  (<u>Id.</u> at 73)  Medical expert Dr. Lesko also concluded that

a light work category would be sufficiently prophylactic to

prevent aggravation of his condition.  (<u>Id.</u> at 854)  He

determined that Plaintiff's daily activities as detailed by his

testimony and additional evidence would not aggravate his

condition.  (<u>Id.</u>)

     The ALJ's reliance on the opinions of non-examining

physicians to support his conclusion that Plaintiff's claims

were not credible is proper because these opinions were based on

evidence in the record.

26

CONCLUSION

Thus, the ALJ properly based his finding that Plaintiff's claims were not credible on his failure to seek medical treatment, his continued employment and the opinions of non-treating physicians.  The Court affirms the ALJ's determination that Plaintiff was not disabled as defined in the Social Security Act.  20 CFR § 404.1520(e).

Defendant's motion for summary judgment is GRANTED. Plaintiff's motion for summary judgment or remand is DENIED.

IT IS SO ORDERED.

Dated: 5/5/05                    /s/ CLAUDIA WILKEN
                                 CLAUDIA WILKEN
                                 United States District Judge

27